T. G. INGHRAM, DOING BUSINESS AS T. G. INGHRAM & SON, APPELLEE, v. UNION STOCK YARDS COMPANY, APPELLANT: RECORD LIVE STOCK COMMISSION COMPANY, APPELLEE.
274 N. W. 185

FILED JUNE 30, 1937. No. 30057.

*Brown, Fitch & West,* for appellant.

*O'Sullivan & Southard* and *William R. Patrick, contra.*

Heard before GOSS, C. J., ROSE, GOOD, DAY and CARTER, JJ., and SPEAR and KROGER, District Judges.

GOSS, C. J.

This was a replevin action, in which a jury was waived and by stipulation it was tried to the district court without a jury on the same pleadings as filed in the county court. It resulted in a judgment for plaintiff for the immediate possession of the seven head of cattle taken under the writ from defendant Union Stock Yards Company, and a judgment for damages for five cents and for costs, denying that company any award for expenses of caring for the cattle while their possession was withheld, and in a dismissal of the Record Live Stock Commission Company from the case. The Union Stock Yards Company appealed.

Plaintiff, who will be called Inghram, had been in the live stock business at the Union Stock Yards since 1896, with the exception of two years. Under the Packers and Stock Yards Act passed by the congress in 1921, he came under the definition of a "dealer" and the Union Stock Yards Company was, under that act, a "stock yard owner." The act made it the duty of every stock yard to furnish service "without discrimination," to "establish, observe and enforce just, reasonable and nondiscriminatory regulations and practices in respect to the furnishing of stock yard services" (7 U. S. C. A. ch. 9, sec. 208) and to make and determine reasonable rates and charges. Such printed rules and regulations, established by the stock yards company, containing tariffs and rules, were in evidence, offered by plaintiff and not objected to.

One of the rules in the printed tariff provided that no person should engage in the live stock commission business or the business of dealing in live stock in these yards unless he had provided a bond running direct to the company or was bonded by another who carried proper bond. The bond was not to be less than $10,000. Inghram

furnished such a bond, with a bonding company as surety, for the period of one year from February 2, 1933, assuring the stock yards company on behalf of "T. G. Inghram and traders for whom they clear" that all charges on account of live stock handled would be paid. One of the conditions written in the bond to which it was recited as subject was this: "That the agent hereunder has not within the knowledge of the assured been at any time a defaulter in the payments of amounts due to the assured." For brevity, the bond had provided that Inghram should be called the "agent."

When the bond expired it was sought to be renewed by a short form of continuation certificate issued by the bonding company. But in the meantime Inghram had questioned, and had refused to pay, certain charges made by the stock yards company and the company had sued him in the courts of the United States thereon, and the evidence shows that, while that suit had been settled, yet there was another suit between the parties over another default of plaintiff herein to pay charges said to be levied under the stock yard's tariffs. So, while the stock yards company did not object to the fact that the bond was sought to be renewed by the continuation certificate, it refused to consider this as renewing the bond because of the recital in the bond which we have quoted in the preceding paragraph. It claims that Inghram had defaulted in payment "of amounts due to the assured" and it claims that the bonding company could not be held on such a bond for later defaults in the face of that recital.

So there was no bond of Inghram in force after the original had expired on February 2, 1934, unless we should hold that the "continuation certificate" renewed the former bond and that thus the minds of the parties met, even though it appears that they did not in fact meet on the recognition of the renewal of the bond. We find ourselves unable so to hold. We are of the opinion that Inghram had at least technically defaulted in his duty to pay charges fixed by the tariff and that the stock

yards company was justified in refusing to accept a renewal of his bond containing a statement that he had not so defaulted. If occasion should arise where the bonding company was sued by the stock yards company on such a bond, the bonding company might seek to defend on the ground that it was not liable by reason of this false statement which induced it to issue the bond.

Inghram also claims that he was entitled to delivery of the seven head of cattle because of the so-called "open order" of Record Live Stock Commission Company, from whom he had purchased the cattle on the 12th of February, 1934. This concern was duly registered under the Packers and Stock Yards Act as a "market agency" and was engaged in the business of buying and selling in commerce live stock on a commission basis. It is agreed that it had a bond to the Union Stock Yards Company in full force.

To speed up the weighing and delivery of live stock in large number and often in small lots, it is necessary that changes of title be facilitated at the scales where it usually takes place. From the seller this is usually effected by an oral statement made by one known to the weigher to be duly authorized to the man at the scales, who quickly makes a record of the weights and of the purchaser. The stock is quickly moved and others with their record follow. In this instance the cattle were not to be moved from the yards. After going over the scales they immediately passed to the possession of the stock yards company, which moved them to a holding pen and locked its gate. If the company had been satisfied with the record of title, it would have delivered them to Inghram without the necessity of a replevin action.

Periodically, and usually about the first of every year, the stock yards company prints for the use of commission men on its market a list of many purchasers on the market whose credit is supposed to be good, most of whom have given bonds to the company, as, for instance, Inghram had done early in 1933. At the bottom of the list is a blank which may be filled out and signed by the commission

company, directing the stock yards company to "deliver to any of the above parties all live stock sold or weighed by us till further notice." The commission firm may strike off any of the names on the printed list or it may add any names. Inghram's name was on the list. It was the practice or custom of the stock yards company to recognize and consider that any party on the list was entitled to the possession of any live stock as soon as it had been weighed at the instance of any signer of the open order. The paper is entitled "Open orders for commission firms, packers, shippers and traders." This one was executed by Record Live Stock Commission Co., by A. G. Robinson, December 16, 1933. It had not been revoked and was considered by the Record company in effect when they had in the usual way directed the man at the scales to weigh the cattle and identified Inghram as the purchaser.

These open orders have been referred to rather loosely in the testimony as "letters of credit." They seem to be that only to the extent that they direct the company to deliver to any purchaser named on the list all live stock sold or weighed to them. In other words, the seller appears to take his chances in getting his pay for the stock or for any charges against them, if he has not already received whatever he is entitled to.

After this occurrence Inghram continued to do business on the market, but did not rely on his bond or upon the open order. He obtained from some duly bonded agency a so-called "release order," of which two samples, used by him to clear cattle bought by him after they were weighed, are in the record. These are card forms signed by the commission firm making the sale directing delivery to T. G. Inghram & Son.

All parties were stubborn in their attitudes in the particular case involved. Only those who were legally right ought to be entitled to that expensive privilege.

One who has the right of possession of personal property is entitled to replevy it when possession is refused.

We are unable to see how the stock yards company got any more or better authority to turn over to Inghram the cattle he purchased from others about the same time, which were secured upon release orders, than was obtained here by the open order from Record Live Stock Commission Company, which it refused to honor. Both merely directed delivery. Neither showed any special reason for clearance. The evidence shows that, if the Record company had executed a card such as we have described, the stock yards company would have honored it. Inghram had title to and the right of possession of the cattle. In the circumstances we are of the opinion the stock yards company had no legal right to refuse to deliver the cattle without a further release. We see no violation of the national act, no violation of the tariffs or rules of the stock yards, or any other legal liability that could have arisen out of the compliance with the request. The judgment of the district court is

AFFIRMED.